IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA

Alexandria Division

| | |
|---|---|
| **Charquan Farmer,** ) | |
|     **Plaintiff,** ) | |
| ) | |
| v. ) | 1:21cv122 (LMB/IDD) |
| ) | |
| **G. Payne,** ) | |
|     **Defendant.** ) | |

MEMORANDUM OPINION

Before the Court is a Motion for Summary Judgment ("Motion") [Dkt. No. 53] filed by defendant Giovanni Payne ("Payne" or "defendant") in this civil rights action initiated by Virginia state prisoner Charquan Farmer ("plaintiff" or "Farmer"). In his Complaint, plaintiff alleges that the defendant used excessive force after escorting him to a housing unit in the Henrico County Regional Jail West. [Dkt. No. 1]. Defendant contests this allegation and has submitted an affidavit as well as video and photographic evidence in support of his argument that his actions were objectively reasonable under the circumstances. See [Dkt. No. 54]. Plaintiff has filed two oppositions to the Motion [Dkt. Nos. 61, 63] to which defendant has responded [Dkt. No. 64]. Defendant's Motion is therefore ripe for consideration and, for the reasons that follow, will be granted.

**I. Background**

A.   *Evidence Considered in Compilation of Statement of Undisputed Facts*

The information listed in the statement of undisputed facts derives primarily from surveillance footage submitted by defendant. See [Dkt. No. 57] at 9. The Court has also considered every other item of admissible evidence the parties have filed in support of their positions. For defendant, the evidence includes Payne's affidavit, id. at 1-3, an "Incident Detail"

report, id. at 5, and a "Nursing Progress Log Note," id. at 8. For plaintiff, the evidence includes documents related to an internal investigation of defendant's actions [Dkt. No. 61-1; Dkt. No. 61-2 at 1-11], photographs of plaintiff's injuries [Dkt. No. 61-2 at 12-25], and a letter/affidavit plaintiff submitted in opposition to a previously filed motion to dismiss [Dkt. No. 33]. The letter/affidavit has been considered because it was "subscribed and sworn to" before a notary public, rendering it admissible at summary judgment. See McCoy v. Robinson, No. 3:08cv555, 2010 WL 3735128, at *2 n.3 (E.D. Va. Sept. 22, 2010) ("There is a marked difference between acknowledging a signature and signing a document under oath. An acknowledgment merely verifies that the person named executed the document in question. By swearing to a document, on the other hand, one vouches that the contents of the writing are true. A person who swears falsely may be guilty of a felony.") (citing Wisniewski v. Johnson, 223 Va. 141 (1982)).

Although plaintiff also submitted two oppositions to defendant's Motion which are notarized and contain what plaintiff calls "sworn statements," those documents do not contain any language indicating they were sworn to under penalty of perjury or that the notary administered an oath to plaintiff. See [Dkt. No. 61] at 1-6; [Dkt. No. 63] at 1-8. Consequently, although the argument these documents contain has been considered in the analysis of the Motion, the information they contain cannot contribute to the statement of undisputed facts. See United States v. White, 366 F.3d 291, 300 (4th Cir. 2004) (emphasizing that unsworn argument does not constitute evidence); Network Computing Servs. Corp. v. Cisco Systems, Inc., 152 F. App'x 317, 321 (4th Cir. 2005) (observing that a "notary's certificate simply means that the [a] signature is authentic" and stating that such a certificate "is not a substitute for language indicating that the witness understood he risked prosecution for perjury if he gave false testimony"); McCoy at *2 (finding prisoner-plaintiff's "affidavits" inadmissible at summary

2

judgment because "their content [was] not sworn to under penalty of perjury and there [was] no indication that the notary administered an oath to Plaintiff"). Plaintiff's complaint is also unsworn and thus the facts alleged will not be considered. See [Dkt. No. 1].

Finally, plaintiff submitted a damaged disc in support of his position. Due to the damage, the disc's contents were not accessible; however, it appears from plaintiff's pleadings and the still photographs he submitted that the disc contained only the video footage defendants have otherwise submitted. See [Dkt. No. 61] at 1 (labeling the disc "Attachment C" and describing it as "video of surveillance footage from the Henrico County Sheriff's Office"). Because the Court has access to the video footage through the flash drive submitted by defendants, there is no reason to delay adjudication of the currently pending Motion on the basis of the damaged disc plaintiff submitted.

B.  *Statement of Undisputed Facts*

The following facts are not in dispute, except where indicated by footnotes. At all times relevant to this lawsuit, defendant was employed by the Henrico County Sheriff's Office as a deputy sheriff and was stationed at Henrico County Regional Jail West ("HCRJW"), where plaintiff was an inmate.

On September 26, 2019, at approximately 9:20 a.m., Payne was assigned to remove plaintiff from dayroom 222, where plaintiff had been involved in "a physical altercation with another inmate." [Dkt. No. 57] at 2. Payne took plaintiff to the booking station to speak with a supervisor, Sergeant Saltarelli. [Dkt. No. 63-1] at 3. Saltarelli asked plaintiff if he had any enemies, in response to which plaintiff stated that he "may have a problem in one of the cells." Id. Saltarelli assigned plaintiff to holding cell 13, and Payne began to lead plaintiff down the

hallway to the cell. Id. Upon reaching cell 13, Payne removed Farmer's handcuffs, unlocked the cell door, and asked him to step inside the cell. Id. Farmer refused.[1] Id.

Farmer then attempted to move around Payne and return down the hall in the direction from which they had come.[2] [Dkt. No. 57] at 9 ("Video Footage w:xx:yy.zzz") at 9:18:07.467 – 9:18:12.307. In response, Payne attempted to restrain Farmer. Video Footage at 9:18:13.027. The video shows Farmer intensely resisting Payne's efforts to get him into the cell, using his arms and legs to push off the walls in an attempt to break from Payne's grasp. Id. at 9:18:15.985 – 9:18:32.072.



*Screenshot of Video Footage at 9:18:15.985*

---

[1] Plaintiff takes issue with defendant's terse explanation of this event. He claims to have had enemies in holding cell 13 and that, because he feared for his life, he requested to speak to a supervisor about his housing assignment. Plaintiff alleges that Payne denied this request; however, plaintiff does not contest the fact that he refused to enter holding cell 13 or that he had already spoken with Sergeant Saltarelli about his cell assignment.

[2] Plaintiff attempts to offer contextual details with respect to this fact, stating that he informed defendant he feared for his safety and that defendant failed to secure the lock to the holding cell. Plaintiff does not deny that he ignored defendant's orders and attempted to evade his grasp.



*Screenshot of Video Footage at 9:18:21.978*



*Screenshot of Video Footage at 9:18:32.072*

The two grappled with each other for approximately thirty seconds before Payne was able to sweep plaintiff's leg, bringing plaintiff to the ground. Id. at 9:18:13.027 – 9:18:41.006. Payne landed on top of plaintiff in the process.[3]  Id. at 9:18:41.806.



*Screenshot of Video Footage at 9:18:46.762*

In the video, two inmates from cell 13 can be seen observing Payne and Farmer continue to struggle against each other as the parties rose to their feet while fighting.[4] Id. at 9:18:41.806 –

---

[3] Defendant asserts that Farmer landed on top of him, but the video demonstrates otherwise.

[4] Payne alleges that plaintiff elbowed him in the process of breaking free from his grip, but plaintiff contests this fact. The video clearly shows the two grappling, but whether plaintiff's elbow connects with Payne is not clear. In his second opposition, plaintiff attempts to justify his behavior by stating that he "was in fear [for] his life and was afraid of what could possibly happen" if he was placed in holding cell 13.

6

9:19:11.667. During the struggle with plaintiff, Payne's radio disconnected from its holster.[5] Id. at 9:18:50.267.

After approximately thirty additional seconds of grappling, the video shows Farmer swinging his arms in a wild fashion, breaking free from Payne in the process, and running down the hallway, with Payne in pursuit. The video shows that Payne's radio had been dislodged during the fight. Id. at 9:19:10.747 – 9:19:15.787.



*Screenshot of Video Footage at 9:19:14.633*

After turning two corners, plaintiff arrived at a doorway through which another Sheriff's Office employee emerged. Id. at 9:19:16.808. Plaintiff slowed down at this point but continued to flee just steps ahead of Payne. Id. at 9:19:16.808 – 9:19:19.012.

---

[5] Plaintiff repeatedly faults Payne for not calling for assistance at the time plaintiff declined to enter holding cell 13, before the two began to fight each other.

What occurs next was not captured on the video due to an apparent blind spot in HCRJW's surveillance camera system. Despite the lack of video evidence, the parties agree that plaintiff next ran up to Sgt. Saltarelli and then either stopped or was stopped. [Dkt. No. 57] at 2. In a report filed a few hours after the event, Saltarelli wrote that upon seeing plaintiff run toward him, he "placed [plaintiff] against the wall." [Dkt. No. 54] at 5. Saltarelli observed that plaintiff had his "fist clenched" throughout this encounter. Id. Payne nearly simultaneously caught up to plaintiff and once more brought him to the ground. [Dkt. No. 57] at 2. At some point in this process, Payne struck plaintiff in the face.[6] Id. A camera located in a different part of the jail showed other deputies running toward the commotion just seconds after the parties disappeared from view. Video Footage at 9:19:28.632.

Less than twenty minutes after these events, plaintiff had a medical examination which showed he had a slight nosebleed, a "small scratch under his nose," and skin abrasions on his arm, chest, neck, and right-upper shoulder. [Dkt. No. 57] at 8. The medical report indicated that plaintiff did not complain of pain or discomfort. Id. For these injuries, plaintiff seeks $1 million in monetary damages. [Dkt. No. 1] at 5.

---

[6] The parties dispute whether Farmer struck Payne before Payne struck plaintiff. Payne claims that plaintiff struck him in the face twice, an account corroborated by several deputies in an incident report filed immediately after the encounter. Plaintiff denies this, stating that he "was not resisting at all at this moment." [Dkt. No. 33] at 2. Plaintiff has also introduced evidence that shows that he faced a disciplinary charge for "assault on staff" that was later reduced to "resisting restraint." See [Dkt. No. 63-1] at 23. He argues that this constitutes evidence he did not strike defendant Payne. [Dkt. No. 63] at 5. There is also a discrepancy in the record as to whether Payne hit plaintiff once, twice, or three times. See [Dkt. No. 57] at 2-3 (affidavit stating Payne struck Farmer twice); Id. at 5 (incident report stating Payne "delivered 2 to 3 stunning strikes"); [Dkt. No. 61-1] at 3 (investigative report stating that Payne "used one stunning technique to the inmate's forehead").

8

## II. Standard of Review

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "A dispute is genuine if a reasonable jury could return a verdict for the nonmoving party," and "[a] fact is material if it might affect the outcome of the suit under the governing law." Variety Stores v. Wal-Mart Stores, Inc., 888 F.3d 651, 659 (4th Cir. 2018). Once the moving party has met its burden to show that it is entitled to judgment as a matter of law, the nonmoving party "must show that there is a genuine dispute of material fact for trial … by offering sufficient proof in the form of admissible evidence." Id. (quoting Guessous v. Fairview Prop. Invs., LLC, 828 F.3d 208, 216 (4th Cir. 2016)). In evaluating a motion for summary judgment, a district court should consider the evidence in the light most favorable to the nonmoving party and draw all reasonable inferences from those facts in favor of that party. United States v. Diebold, Inc., 369 U.S. 654, 655 (1962).

## III. Analysis

Defendant argues that he is entitled to judgment in his favor under two theories. First, he argues that the summary judgment record conclusively establishes he did not violate plaintiff's right to be free from excessive force, and second, even if he did violate plaintiff's right, he is entitled to qualified immunity. For the reasons explained below, the Court concludes that each of defendant's arguments is meritorious and that defendant is entitled to judgment in his favor.

A.  *Excessive Force Claim*

A district court assessing a claim of excessive force must take a holistic approach and inquire whether "the [defendant] officers' actions [were] objectively reasonable in light of the facts and circumstances confronting them." Lombardo v. City of St. Louis, Mo., 141 S. Ct.

9

2239, 2241 (2021) (quoting Graham v. Connor, 490 U.S. 386, 397 (1989)) (internal quotations omitted).[7] "A court must make this determination from the perspective of a reasonable officer on the scene, including what the officer knew at the time, not with the 20/20 vision of hindsight." Kingsley v. Hendrickson, 576 U.S. 389, 397 (2015). Factors relevant to the inquiry include "the relationship between the need for the use of force and the amount of force used; the extent of the plaintiff's injury; any effort made by the officer to temper or to limit the amount of force; the severity of the security problem at issue; the threat reasonably perceived by the officer; and whether the plaintiff was actively resisting." Id.

Here, the vast majority of the factors discussed in Kingsley resolve in favor of defendant Payne. With respect to the first phase of the incident—that is, defendant's attempt to restrain plaintiff following his refusal to enter holding cell 13—plaintiff's disobedience and attempt to flee unquestionably justified an initial use of force against him. See Bryant v. Johnson, No. 7:11-cv-75, 2012 WL 4458214, at *6 (W.D. Va. Aug. 21, 2012) (finding "[s]ome type of force was necessary to compel plaintiff's compliance in light of his continued intransigence" and refusal to voluntarily step onto a scale); Lamson v. Koon, No. 9:18-0812-DCC-BM, 2019 WL 9341411, at *8 (D.S.C. July 16, 2019) ("Based on the evidence presented, there is not a genuine issue of fact as to whether Burnett and Browder were justified in using some degree of physical force to subdue a clearly fleeing and resisting suspect, based on Plaintiff's own conduct and his failure to

---

[7] In Lombardo, the Supreme Court clarified that this standard applies in all excessive force cases, regardless of the specific source of legal protection. See Lombardo, 141 S. Ct at 2241, n.2 ("We need not address whether the Fourth or Fourteenth Amendment provides the proper basis for a claim of excessive force against a pretrial detainee in Gilbert's position. Whatever the source of law, in analyzing an excessive force claim, a court must determine whether the force was objectively unreasonable in light of the facts and circumstances of each particular case.") (quoting Kingsley v. Hendrickson, 576 U.S. 389, 397 (2015)) (internal quotations omitted).

comply with legitimate instructions, none of which Plaintiff has presented any evidence to dispute.").

The video evidence shows plaintiff continuously and aggressively fighting against defendant's efforts to immobilize him, going as far as to push against the jail's walls to resist Payne's grasp. Such ongoing and persistent resistance tilts the sixth Kingsley factor strongly in defendant's favor and justified a continued and even escalating use of force on Payne's part. See, e.g., Williams v. Bishop, No. RWT-12-1616, 2014 WL 4662427, at *7 (D. Md. Sept. 17, 2014) (finding use of pepper spray reasonable after plaintiff "continued to resist [physical] efforts to subdue him"). In this light, at least with respect to the first portion of the physical encounter between plaintiff and defendant, there can be no doubt that the amount of force defendant used was justified. In fact, it would have been reasonable for Payne to use even greater force because the amount of force that he actually used was not enough to get plaintiff under control given that plaintiff was able to break loose and run down the hall.

As for the use of force occurring *after* plaintiff's escape and flight, although there is a factual dispute regarding whether plaintiff struck defendant in the face, the record shows that Payne acted reasonably during his pursuit and ultimate apprehension of plaintiff. As relevant to the fourth Kingsley factor, plaintiff's flight objectively represented a significant security threat within HCRJW. See Emonds v. Boswell, No. 3:14cv30, 2015 WL 6674188, at *4 (E.D. Va. Oct. 30, 2015) (stating that a combative inmate—even when "pinned to the ground"—represented "a severe security problem").

Relatedly, the degree of Farmer's forceful resistance to Payne's efforts to subdue him as well as his flight down the hallway toward the booking desk where other inmates and deputies were present support the conclusion that Payne would have recognized the threat plaintiff posed

11

to HCRJW staff and inmates alike. Indeed, Payne was assigned to move plaintiff—who had a reputation of being disruptive—to holding cell 13 because plaintiff had just had an incident with another inmate. Additionally, as the video evidence shows, in escaping defendant's grasp, plaintiff exhibited significant strength and aggressive behavior. Over the course of roughly a full minute, plaintiff and defendant struggled against each other, taking turns forcing each other into the jail's walls. And by running away from Payne while unrestrained, plaintiff had an increased opportunity to encounter—and possibly attack—other occupants of the jail.[8] Taken together, plaintiff's acts would have been perceived as a threat by any reasonable correctional official. Cf. Haizlip v. Alston, No. 1:14cv770, 2016 WL 4184426, at *18 (M.D.N.C. Aug. 5, 2016) (finding defendants reasonably perceived a threat from plaintiff who "had just attempted to engage Defendant Alston in a physical altercation and then resisted Defendant Alston's efforts to put him in the holding cell," concluding that "[p]laintiff's resistance presented an objectively serious threat of escape and/or harm to Defendant Alston, Defendant Moore, and any others in the jail").

Finally, the brevity and fast-paced nature of the events cannot be ignored. Although plaintiff and defendant fought with each other for roughly a minute outside of holding cell 13, less than *ten seconds* passed between plaintiff's flight and defendant's reapprehension of him. Briefer still was the amount of time between plaintiff being stopped and Payne's act of bringing plaintiff to the ground. Indeed, as shown by the video footage until coverage was lost, Payne remained only a few steps behind plaintiff. Accordingly, even if plaintiff had been stopped by other sheriff deputies, that could not have happened for more than one or two seconds before

---

[8] Plaintiff's resistance and flight from Payne also resulted in the door of holding cell 13 standing open and unmonitored. The video footage shows that two inmates left the holding cell and wandered into the hallway as Payne pursued plaintiff. This constituted yet another security threat created by plaintiff's conduct.

Payne's arrival. In such a small window of time, Payne would not have had a sufficient opportunity to see plaintiff, register that he had stopped moving, decide that a threat no longer existed, and stop his own momentum. To conclude that under these circumstances Payne acted objectively unreasonably by taking plaintiff to the ground and striking him would fly in the face of the deference courts generally provide to officers of the law, who are forced to make quick decisions in dynamic and often dangerous situations.

In summary, regardless of whether plaintiff struck defendant in the face, the significant and obvious threat he posed to the occupants of HCRJW rendered reasonable the amount of force defendant ultimately employed. And, although not a dispositive fact, it is undisputed that the force Payne used did not result in significant injury to plaintiff because a medical record created at 9:34 a.m.—less than twenty minutes after the incident—revealed that plaintiff had a "slt. nose bleed with small scratch under his nose, multiple skin abrasions on arm, chest, neck, r-upper shoulder" and did not complain of pain or discomfort.[9] [Dkt. No. 57] at 8.

Pre-Kingsley and Lombardo decisions in the Fourth Circuit deemed such injuries de minimis and not supportive of relief for an excessive force claim. See, e.g., Melvin v. North Carolina Dep't of Corr., 64 F.3d 658 (4th Cir. 1995) (unpublished) (finding that the cuts and abrasions suffered by an inmate during an altercation with prison officers as they attempted to take his radio from him were merely de minimis injuries); Cox v. Gaskins, No. 5:01CT936H, 2003 WL 23857306, at *2 (E.D.N.C. May 30, 2003) (unpublished) (finding that two lacerations to plaintiff's head and an injury to his nose were de minimis injuries), aff'd, 78 F. App'x 310 (4th Cir. Oct. 22, 2003) (unpublished).

---

[9] It is more likely that these injuries were the result of plaintiff's first interaction with Payne, which appears to have lasted considerably longer than the second.

Plaintiff makes several arguments that merit brief discussion. First, he calls into question what Payne could or should have done differently under the circumstances. For instance, plaintiff repeatedly faults Payne for failing to call other officers after he refused to enter holding cell 13. [Dkt. No. 62] at 2. He also faults Payne for not calling for assistance while chasing plaintiff. Id. at 3. But even if Payne could or should have requested backup, plaintiff surely must recognize that no assistance would have been necessary but for his refusal to comply with a lawful directive from Payne.

Plaintiff also argues that defendant violated HCRJW policy by failing to contact a supervisor after plaintiff requested to speak to one. The record entirely belies plaintiff's contention. Before being brought to holding cell 13, plaintiff spoke to Sergeant Saltarelli about his housing assignment. Even if this had not occurred, and even if Payne's failure to contact a supervisor did violate jail policy, policy directives "do not … establish constitutional minima" and a correctional officer's "variance" from policy directives "does not per se establish a violation of [an inmate's] constitutional rights." Harper v. McCloud, No. 2:12cv656, 2014 WL 1159129, at *21 (S.D.W. Va. Mar. 21, 2014), aff'd, 575 F. App'x 206 (4th Cir. 2014).

Plaintiff also attempts to justify his behavior by repeatedly explaining that he had enemies in holding cell 13 and thus feared for his life at the prospect of being housed there.[10] [Dkt. No. 63] at 2. But a plaintiff's subjective mental state plays no role in determining whether a defendant employed excessive force against him. See, e.g., Kitchen v. Ickes, 116 F. Supp. 3d 613, 628-29 (D. Md. 2015) ("Plaintiff's subjective belief that a lesser amount of pepper spray

---

[10] Despite plaintiff's claim that the inmates in cell 13 posed a risk to his safety, the record shows that plaintiff spent at least nine days in that cell following his encounter with Payne, until October 5, 2019, when he fought with his two cellmates for which he received a disciplinary charge. [Dkt. No. 65-2].

14

could have been used or that Ickes should have placed himself in harms' way by entering the cell while Plaintiff continued to hold his cellmate restrained on the floor, is of no legal significance."); Patrick v. City of Aiken, No. 1:16-cv-3496-JMC, 2019 WL 4736453, at *5 (D.S.C. Sept. 27, 2019) ("[T]he court agrees with Defendants that Plaintiff's subjective beliefs about his own actions do not dictate the outcome of the evaluation of his excessive force claim.").

Finally, the relief plaintiff requests in this action is entirely unmoored from reality. In light of the minimal injuries plaintiff sustained during his encounter with Payne, there is simply no evidentiary basis for the provision of $1 million in damages. Complaints seeking damages incommensurate with the harm they allege have been dismissed as frivolous in this jurisdiction. See, e.g., Anderson v. Pollard, No. 3:20cv489, 2020 WL 9349174, at *2 (E.D. Va. Aug. 24, 2020).

B.     *Qualified Immunity*

Although the Court finds that defendant did not violate plaintiff's right to be free from the use of excessive force, it will also address defendant's second argument—that he is entitled to qualified immunity. "Determining whether an official is entitled to qualified immunity typically involves two inquiries: (1) whether the plaintiff has established the violation of a constitutional right, and (2) whether that right was clearly established at the time of the alleged violation." Halcomb v. Ravenell, 992 F.3d 316, 319 (4th Cir. 2021).

Under the second prong of the qualified immunity test, even if an official has violated an inmate's constitutional right, he remains entitled to immunity if the right was not so "clearly established" that "a reasonable official would understand that what he is doing violates that right." Hope v. Pelzer, 536 U.S. 730, 739 (2002). It is a "longstanding principle that clearly

established law should not be defined at a high level of generality." White v. Pauly, 137 S.Ct. 548, 552 (2017) (internal quotation omitted). Instead, the "clearly established law must be particularized to the facts of the case so as to avoid transforming qualified immunity into a rule of virtually unqualified liability." Id. (internal quotation omitted).

The Court has reviewed relevant precedent and cannot conclude that under the circumstances plaintiff had a clearly established right to be free from the force Payne used against him. Far from supporting the notion that an inmate has the right to be free from the use of force after resisting an officer's lawful commands, fleeing from that officer, and fighting that officer, Fourth Circuit decisions—many of which are discussed above—confirm the reasonableness of defendant's actions. For this reason, defendant is entitled to qualified immunity.

## IV. Conclusion

For the reasons stated above, the Court concludes defendant Payne is entitled to judgment in his favor with respect to plaintiff's claim that he used excessive force against him. Accordingly, judgment will be entered in defendant's favor by an order to be issued with this Memorandum Opinion.

Entered this 23rd day of May 2022.

Alexandria, Virginia

/s/ 
Leonie M. Brinkema
United States District Judge